# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**T. PARKER HOST, INC.,**

      **Plaintiff,**

**v.**

                                    **Civil Action No. 2:16 cv 411**

**KINDER MORGAN LIQUIDS
TERMINALS, LLC, et al.,**

      **Defendants.**

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, T. Parker Host, Inc. ("TPH"), by counsel, asks the Court to enter an order enjoining defendants, Kinder Morgan Liquids Terminals, LLC, Kinder Morgan Bulk Terminals, Inc., Kinder Morgan Services LLC, Kinder Morgan Southeast Terminals, LLC, Kinder Morgan Virginia Liquids Terminals LLC, Kinder Morgan Materials Services, LLC, Kinder Morgan G.P., Inc., Kinder Morgan Operating L.P. "A", Kinder Morgan Operating L.P. "C", Kinder Morgan Operating L.P. "D", Kinder Morgan Transmix Company, LLC, Kinder Morgan Energy Partners, Nassau Terminals, LLC, Kinder Morgan Terminals, and Kinder Morgan, Inc., ("Defendants" or "Kinder Morgan") from denying TPH access to, and the ability to coordinate port calls at, terminals owned and/or operated by Defendants or otherwise enforcing against TPH the policy outlined in the letter ("the Blacklist Notice") and list ("the Approved Agents List") attached as **Exhibit 1**. Because TPH will prove all four elements necessary for the grant of a preliminary injunction, the Court should grant the motion and enjoin Defendants during the pendency of this suit and the complaint filed with the Federal Maritime Commission.

## I. Factual Background[1]

Since 1923, TPH has provided services as a vessel agent in Hampton Roads. Kinder Morgan was formed in Houston, Texas as an off-shoot of Enron in 1997, focusing on oil pipelines. Kinder Morgan is now the largest energy infrastructure company in North America. It has the largest natural gas network in North America with 69,000 miles of pipelines. It is the largest transporter of petroleum products and carbon dioxide. It is the largest independent terminal operator in North America.

Since Kinder Morgan's emergence in marine terminal operations, TPH has continued to provide agency services to customers calling on numerous terminals, including Kinder Morgan terminals. In the industry, marine terminal operators and agents have historically had symbiotic relationships. The terminal takes in ships to unload cargo. The agent guides the ship and coordinates all of the other necessary local services including: ship representation, vessel attendance, customs clearance, cargo documentation, and husbandry services. Kinder Morgan owns and/or operates thirty-seven marine terminals along the east and gulf coasts that were serviced by TPH, including Pier IX in Newport News, as well as Kinder Morgan's Norfolk Terminal, Elizabeth River Terminal in Chesapeake, and South Hill Terminal in Chesapeake.

In early May 2016, TPH learned that it would be banned from doing its job at all terminals owned or managed by Kinder Morgan, effective July 1, 2016. Specifically, on May 4,

---

[1] TPH incorporates the allegations in the Complaint by reference and intends to offer evidence of the same at a hearing to be scheduled with the Court. "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G. G. v. Gloucester Cnty. Sch. Bd.*, __ F.3d __, 2016 U.S. App. LEXIS 7026, at *37 (4th Cir. 2016).

2016, Kinder Morgan began distributing the Blacklist Notice and the Approved Agents List to TPH's customers, as well as TPH's various regional offices.

The Blacklist Notice announced a new Kinder Morgan "policy regarding vessels that call on any Kinder Morgan Terminal and require use of vessel agents." The Blacklist Notice requires all vessel agents, port agents, protective agents, and subagents to be approved by Kinder Morgan before they can coordinate a port call or obtain access to vessels, effective July 1, 2016 ("the Blacklist Notice"). The Blacklist Notice proclaims: "Further, approved Agents shall NOT act as a subagent for a non-approved Agent." And, "[a]ny attempt to circumvent this agency policy may result in Kinder Morgan rejecting a vessel calling on a Kinder Morgan facility or dock, ceasing cargo operations, or requiring the vessel to immediately vacate the berth . . . ." Kinder Morgan claims to "reserve[] the right and sole discretion to reject or approve any Agent." The Approved Agents list accompanied the Blacklist Notice and featured sixty-three (63) "Approved Agents," who, unlike TPH, are allowed to conduct business as usual at Kinder Morgan terminals. Kinder Morgan intentionally excluded TPH from the Approved Agents List, without legitimate cause and by improper methods.

In addition to concocting the Approved Agents List to blacklist TPH, the Blacklist Notice purports to apply to any terminal owned *or operated* by Kinder Morgan, which would include those terminals that Kinder Morgan leases from public as well as private owners. For example, the Nassau Terminal in Fernandina, Florida is owned by Florida's Ocean Highway & Port Authority. A Commissioner of the Nassau Terminal has questioned Kinder Morgan's authority to ban TPH from the Nassau Terminal. Kinder Morgan plans to enforce the Blacklist Notice, notwithstanding, at all of its owned or operated terminals.

3

The Blacklist Notice regulates a broad range of services. It states: "Kinder Morgan must approve of any vessel agent, port agent, protective agent or subagent ("Agent"), **whether nominated or appointed by the cargo owner, shipper, receiver, charterer, vessel owner, or other party**, that conducts the following activities: **1) Coordinates** the port call to/from a Kinder Morgan owned or operated facility or dock, including coordination of vessel movement within the port and shifting to/from the facility or dock; **or 2) Obtains access to the vessel** while the vessel is moored to a Kinder Morgan owned or operated facility or dock." Ex. 1.

To explain, Kinder Morgan has asserted the right to veto the contracts and arrangements between shippers and their agents. Kinder Morgan asserts that *Kinder Morgan*, by its own fiat, must "approve" of the agents *appointed by other entities whose vessels and port calls are actually be handled by agents* like TPH. By the terms of the Blacklist Notice, Kinder Morgan has asserted a unilateral ban on, not only TPH's ability to physically access vessels moored at Kinder Morgan marine terminals, but also on *coordinating* the port call. While coordinating a port call requires Kinder Morgan to provide some general information to the agent about the vessel and its schedule, it involves almost no activity on Kinder Morgan owned and/or operated property. Rather, it is the logistical work of scheduling, phone calls, emails, and the like to ensure that tugboats, harbor pilots, railroads, barges, and all of the other necessary services are available, timely, and as contracted.

In addition, Kinder Morgan has banned other agents from serving as sub-agents for TPH so that Kinder Morgan prevents TPH from serving as a vessel's agent even if TPH does not enter a Kinder Morgan owned or operated terminal. This result further makes clear that any claimed legitimate reason for the Blacklist Notice's ban on TPH is only pretextual. Kinder Morgan has sought the cooperation, by threat and intimidation, of other agents to agree to not serve as a sub-

4

agent for TPH for vessels at Kinder Morgan terminals. Through the Blacklist Notice, Kinder Morgan has attempted to combine with other agents (and with vessel owners and/or charterers) to boycott TPH altogether and prevent it from conducting its business at Kinder Morgan terminals.

Importantly, the right to appoint a vessel or port agent is most often included in the contractual terms of the charterer who actually contracts for the ocean freight of its cargo. These charterers are TPH's primary customers. By issuing the Blacklist Notice, Kinder Morgan intends and is acting to not only destroy TPH, but to control which agents "the cargo owner, shipper, receiver, charterer, vessel owner, or other party" can appoint to service their vessels.

Despite the Blacklist Notice's passing references to insurance and safety, no objective criteria supports exclusion of TPH from the Approved Agents List. Upon information and belief, there was no vetting process or criteria for inclusion on the list. Kinder Morgan has never complained about TPH's service. TPH has consistently maintained an excellent safety track record and proper insurance coverage. Instead, Kinder Morgan officers have since acknowledged to TPH's customers that the exclusion of TPH from the Approved Agents List was intended to block TPH's affiliate's rise in the terminal management market. Moreover, if the reasons Kinder Morgan gave in the Blacklist Notice for the exclusion of TPH, (i.e., safety and insurance) were valid, Kinder Morgan would not have waited from early May until July to enforce the policy. Indeed, notwithstanding that Kinder Morgan attempts to disguise the Blacklist as a policy of general application, motivated by mundane and objective business concerns (i.e. safety and insurance), Kinder Morgan's sole aim with the Blacklist Notice was to single out and destroy the business of TPH and its affiliate, Host Terminals, Inc. Its disingenuous references to safety and insurance are only that – a façade. The façade slipped on or about June 10, 2016, at the Kinder

5

Morgan terminal in Beaumont, Texas where Kinder Morgan posted a sign that read: "T. PARKER HOST, INC. IS NOT ALLOWED ON Kinder Morgan Property. If they show up refer them to call Hans Luetkemier at (504) – 620-4628 Effective 5-19-2016." See Complaint at **Exhibit 2**.

If Kinder Morgan is allowed to ban TPH from accessing terminals owned and/or operated by Kinder Morgan, TPH will suffer a tremendous and irreversible loss of customers. TPH will be unable to perform under its existing contracts and appointments. As a result of Kinder Morgan's improper interference, TPH will lose all of its customers who call on Kinder Morgan owned and/or operated terminals, which over the last three years has constituted approximately $2,200,000 per year in revenues for TPH. In addition, it is typical and customary in the industry for shippers and charterers to use as few different agents as possible, while forming strong working relationships with those agents. Therefore, if TPH's customers are barred from using TPH at Kinder Morgan terminals, they are likely to also not use TPH at non-Kinder Morgan terminals in the future.

Indeed, numerous customers have contacted TPH in the wake of the Blacklist Notice's distribution inquiring: what did TPH do to be excluded from the list? Can we work with TPH after July 1? Have you made any progress with Kinder Morgan so that TPH can serve as an agent for us at Kinder Morgan operated marine terminal facilities? Despite all of the questions, virtually all of TPH's customers also gave two common refrains: (1) this is not surprising from Kinder Morgan and (2) we are going to have to find someone else to serve as our agent come July 1, 2016. Kinder Morgan specifically intended these results when it implemented the Blacklist Notice.

Facing an imminent and catastrophic loss of customers, TPH contacted Kinder Morgan to inquire as to why it was excluded from the Approved Agents List and to learn what it could do to be allowed to serve as an agent for vessel berthed at Kinder Morgan owned or operated marine terminal facilities. First, local TPH employees contacted the terminal managers for the Kinder Morgan terminals at which they regularly work. All of the terminal managers stated that the Blacklist Notice came straight from Kinder Morgan corporate; they had learned of it just before TPH did; they too were surprised to not see TPH excluded from the Approved Agents List; and referred questions to Hans Luetkemeier, Kinder Morgan's Director of National Accounts – Dry Bulk, who was Kinder Morgan's highest ranking official identified on the various versions of the Blacklist.

After TPH made numerous attempts to contact Hans Luetkemeier, he eventually called TPH's Bobby Scott on May 6, 2016. In the call, Luetkemeier refused to provide any details on why TPH was excluded from the Approved Agents List. He only referenced a goal to include companies on the Approved Agents List with whom Kinder Morgan can "create synergies." Luetkemeier even stated that, as far as he knew, TPH had not violated any of Kinder Morgan's safety policies. He also said that TPH could email him a formal request to be included on the Approved Agents List. Immediately after the call, TPH emailed a formal request to be placed on the Approved Agents List. Luetkemeier never replied to that email.

On May 12, 2016, Kinder Morgan's President of Terminals, John Schlosser called TPH's Chief Commercial Officer, Cees Van de Mortel. Schlosser stated that he called to personally inform TPH that he was not going to approve TPH's request to be included on the Approved Agents List. When asked why not, Schlosser stated that TPH obtains too much terminal information as an agent and does not "firewall" between TPH and Host Terminals, Inc.

Schlosser did not describe what "too much terminal information" was. However, when acting as agent at Kinder Morgan marine terminals, TPH only learned the types of information that Kinder Morgan makes available to any of the 63 agents on the approved list, as well as others present at its terminals. Kinder Morgan does not claim this information to be confidential and does not attempt to restrict or protect it in any way. In addition, at least one company on the list of approved agents, FEDNAV International Ltd., is also in the terminal operation business like Host Terminals, Inc.

In a final attempt to resolve the matter, Adam Anderson, TPH's President, and David Host, TPH's Chairman and Chief Executive Officer, met with Schlosser and Kinder Morgan's Chief Commercial Officer, Randall Maffett, in Houston on June 3, 2016. During the meeting, Schlosser and Maffett made it crystal clear why TPH was blacklisted – competition from TPH's affiliated corporation, Host Terminals, Inc., in the terminal business which is separate from the business of serving as an agent for ships. Alluding to Host Terminals, Inc.'s competition with Kinder Morgan, Maffett said that TPH had "pissed in its house" and now had to "pay for it." Comparing itself to other large, powerful energy companies, Kinder Morgan officials stated "you pissed on Exxon Mobil" and have to pay for it. Schlosser stated that Kinder Morgan may consider changing its mind if Host Terminals, Inc. changed its "behavior," (i.e., competing) but not now. Kinder Morgan has insisted on enforcing the Blacklist Notice effective July 1, 2016.

As a result, TPH filed a complaint with the Federal Maritime Commission ("FMC") on June 21, 2016, alleging violations of the Shipping Act of 1984 ("the Shipping Act") and seeking permanent injunctive relief under the FMC's authority and jurisdiction. Specifically, Kinder Morgan has, among other things, imposed an "undue or unreasonable prejudice or disadvantage with respect to any person [TPH]" in violation of 46 U.S.C. § 41106.

On July 1, 2016, TPH filed the Complaint in this Court, commencing this civil action, against Kinder Morgan to pursue preliminary injunctive relief under the Shipping Act and to pursue its remedies under Virginia law. TPH has alleged: (i) one count specifically seeking a preliminary injunction, as provided for by the Shipping Act, (ii) one count alleging tortious interference with contract, (iii) one count alleging tortious interference with terminable contracts, prospective contracts, and business expectancies, and (iv) one count alleging attempted and actual business conspiracy in violation of Virginia Code § 18.2-499(A) and (B) and seeking, among other damages, injunctive relief pursuant to Virginia Code § 18.2-500(B).

## II. Legal Standard

### A. Preliminary Injunctions for Shipping Act Complaints

The Shipping Act, 46 U.S.C. § 40101, *et seq.*, and its accompanying regulations in Title 46 of the Code of Federal Regulations, govern and regulate activities of, among other things, marine terminal operators like Kinder Morgan. The Shipping Act, Chapter 11 of Title 46, contains several prohibitions, including those discussed below from 46 U.S.C. § 41106. When aggrieved by violations of the Shipping Act, "[a] person may file with the Federal Maritime Commission a sworn complaint alleging a violation of this part . . . ." 46 U.S.C. § 41301(a). Although the Shipping Act gives the FMC certain authority and jurisdiction, it also specifically provides for preliminary injunctive relief in United States District Courts in conjunction with pending FMC complaints.

Section 41306 provides: "[a]fter filing a complaint with the Federal Maritime Commission under section 41301 of this title, the complainant may bring a civil action in a district court of the United States to enjoin conduct in violation of this part." 46 U.S.C. § 41306(a). "After notice to the defendant, and a showing that the standards for granting injunctive

relief by courts of equity are met, the court may grant a temporary restraining order or preliminary injunction for a period not to exceed 10 days after the Commission has issued an order disposing of the complaint." § 41306(c). Courts have generally applied the well-known federal preliminary injunction standard when addressing actions under § 41306. *See, e.g., Western Holding Group, Inc. v. Mayaguez Port Comm'n*, 611 F. Supp. 2d 149, 187 (D.P.R. 2009).

### B. Preliminary Injunctions for Violations of Virginia Code § 18.2-499

In addition to creating a cause of action for civil relief and providing for treble damages, attorney's fees and costs, Virginia Code § 18.2-500 specifically provides for preliminary injunctive relief in civil suits. It states:

> Whenever a person shall duly file a civil action in the circuit court of any county or city against any person alleging violations of the provisions of § 18.2-499 and praying that such party defendant be restrained and enjoined from continuing the acts complained of, such court shall have jurisdiction to hear and determine the issues involved, to issue injunctions pendente lite and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel.

Va. Code Ann. § 18.2-500(B).

### C. The Federal Preliminary Injunction Standard

There are four elements necessary for a preliminary injunction. A party seeking a preliminary injunction must establish: "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North*

*Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).[2]

In light of its urgency, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and on evidence that is less complete than a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). And, when the preliminary injunction sought is prohibitive, rather than mandatory, the court's review need not be as exacting. *See Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (quoting *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 333 F.3d 517, 525 (4th Cir. 2003)). The Fourth Circuit "has held that a preliminary injunction's tendency to preserve the status quo determines whether it is prohibitory or mandatory." *Pashby*, 709 F.3d at 319 (citing *E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)). And, the status quo is defined as the "last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C.*, 769 F.3d at 236 (citations omitted). TPH seeks to preserve the status quo.

---

[2] Until 2008, the *Blackwelder* test governed in the Fourth Circuit. *See Blackwelder Furniture Co. Seilig Mfg. Co.*, 550 F.2d 189, 195 (4th Cir. 1977). *Blackwelder* featured a sliding scale to weigh the traditional factors considered for the grant of a preliminary injunction. *See id.* at 196 ("The decision to grant or deny a preliminary injunction depends upon a 'flexible interplay' among all the factors considered."). In 2008 however, the Supreme Court of the United States decided *Winter v. NRDC*, 555 U.S. 7, 20 (2008) on the heels of *eBay v. MercExchange L.L.C.*, 547 U.S. 388, 391 (2006) (addressing the standard for permanent injunctions in a patent case). In *Winter*, the court established a definitive four-part test and rejected the *Blackwelder*-style sliding scale approach for a requirement that the party seeking relief must make a clear showing on each element.

### III. Argument

Because TPH will prove all four elements necessary for the grant of a preliminary injunction, the Court should grant the motion and enjoin Defendants to preserve the status quo during the pendency of this suit and the matter now before the Federal Maritime Commission.

**A.      TPH is Likely to Succeed on the Merits.**

#### 1. Kinder Morgan's Shipping Act Violations

In its complaint filed with the FMC, TPH has alleged that Kinder Morgan has violated the Shipping Act. Specifically, Kinder Morgan's Blacklist Notice violates 46 U.S.C. § 41106. Section 41106 prohibits marine terminal operators from imposing any unreasonable disadvantage on any person. It states: "**A marine terminal operator may not** . . . (2) give any undue or unreasonable preference or advantage or **impose any undue or unreasonable prejudice or disadvantage with respect to any person**; or (3) unreasonably refuse to deal or negotiate." § 41106(2) and (3). Because TPH is a "person," *see* 1 U.S.C. § 1; 46 C.F.R. § 525.1(c)(15), and Kinder Morgan is a marine terminal operator, *see* 46 U.S.C. § 40102(14), Kinder Morgan's actions related to the Blacklist Notice are governed by the Shipping Act. The Blacklist Notice's transparent and undue prejudice and unjustified discrimination against, and to the disadvantage of, TPH violate the Shipping Act.

If marine terminal operators treat similarly situated entities differently, the discrimination "must be based on 'transportation factors.'" *Maher Terminals, LLC v. FMC*, 816 F.3d 888, 890 (D.C. Cir. 2016) ("That term goes back to the Interstate Commerce Act and was extended into the earliest Shipping Act. It is not clear whether it was originally articulated as an interpretation of the statutory term 'undue or unreasonable preference' or whether it was a policy choice."). Specifically,

In order to establish an allegation of an unreasonable preference or prejudice, it must be shown that (1) the two parties are similarly situated or in a competitive relationship, (2) the parties were accorded different treatment, (3) the unequal treatment is not justified by differences in transportation factors, and (4) the resulting prejudice or disadvantage is the proximate cause of the injury. The complainant has the burden of proving that it was subjected to different treatment and was injured as a result and the respondent has the burden of justifying the difference in treatment based on legitimate transportation factors.

*Santa Fe Discount Cruise Parking, Inc. v. Bd. of Trustees of Galveston Wharves*, 2015 FMC LEXIS 44, *20 (FMC 2015) (quoting *Ceres Marine Terminal, Inc. v. Maryland Port Administration (Ceres I)*, 27 S.R.R. 1251 (FMC 1997)).

*Maher Terminals* provides an example of discrimination lacking in such justification. *Maher Terminals* arose from the Port Authority of New York and New Jersey's leasing negotiations and terms in the late 1990s. 816 F.3d at 888. The Port Authority negotiated with, among others, Maher and APM-Maersk. "Maher is an independent marine terminal operator, which means that it has no affiliated carrier fleet, and services only third party carriers and shippers through its rented terminal." *Id.* at 889. "APM-Maersk, on the other hand, is affiliated with the largest ocean carrier-fleet in the United States, Sea-Land, though it also services third party cargo through its terminals." *Id.*

Initially, Maher negotiated for lease terms with the Port Authority and agreed on a tentative annual rate of $68,750 per acre. However, the Port Authority's negotiations with Maher were suspended in 1998, when APM-Maersk began negotiating with The Port Authority. *Id.* Because it found the terms too expensive, APM-Maersk threatened to leave and go to Baltimore. Wielding its power and influence, AMP-Maersk worked the Port Authority down to a deal that resulted in an effective base rent of $19,000 per year. *Id.* The Port Authority then turned back to Maher, but refused to give it the same terms. "Lacking the bargaining power enjoyed by APM-

Maersk, Maher ultimately agreed to an initial base rent of $39,750 per acre, with an escalator, such that the average base rent over the life of the lease would amount to $53,753 per acre." *Id.* That deal was done in 2000.

Deutsche Bank bought Maher in 2007. As the global recession hit in 2008, Maher lost nearly 15% of its business, while APM-Maersk failed to meet volume requirements in its agreement with the Port Authority in 2008, 2009, and 2010, causing its rent to increase. Maher then filed a complaint against the Port Authority, alleging that the differential terms between its and APM-Maersk's leases violated the Shipping Act. Specifically, Maher alleged that the Port Authority had violated 46 U.S.C. § 41106(2) by offering an "unreasonable preference" to APM-Maersk. Although the ALJ and the FMC dismissed the complaint, the D.C. Circuit vacated and remanded. Noting that not extending the same rates alone was discrimination, the court held that "the Commission's explanation as to why APM-Maersk's preference was based on a 'transportation factor' was hopelessly convoluted." *Id.* at 891. The Court recognized that FMC precedent has established that threats based on market power are not a legitimate justification for discrimination and that preferential rates could not be based on status alone. *Id.* (citing *Ceres Marine Terminal v. Maryland Port Administration*, 27 S.R.R. 1251, 1997 FMC LEXIS 32, at *102 (FMC 1997) ("Status alone is not a sufficient basis by which to distinguish between [entities]" the marine terminal operators deals with.")); *Balmill Lumber v. port of New York*, 10 S.R.R. 131 (FMC 1968)).

As the terms of § 41106 make clear, marine terminal operators violate the Shipping Act when they discriminate against one person over another without a legitimate justification or rationale. Here, not only has Kinder Morgan treated TPH differently, Kinder Morgan has acknowledged that it has done so solely because Host Terminals, Inc. competes with Kinder

14

Morgan. As a result, TPH will succeed on the merits in the FMC by proving all four elements necessary for a § 41106(2) violation.

First, TPH and the 63 agents on the Approved Agents List are similarly situated and in a competitive relationship. They all provide agency services to vessels calling on Kinder Morgan terminals. Indeed, as soon as Kinder Morgan issued the Blacklist Notice, TPH's customers began to receive aggressive solicitations from TPH's competitors who are on the Approved Agents List. Second, Kinder Morgan specifically targeted TPH. TPH was the only agent conducting significant business at Kinder Morgan terminals that Kinder Morgan excluded from the Approved Agents List. As noted above, FEDNAV International, Ltd. is on the approved list, although it, directly or through an affiliate, operates marines terminals. Moreover, Kinder Morgan's executives have admitted that Kinder Morgan intentionally wanted to impose insurmountable burdens on TPH *because* Kinder Morgan wants to injure TPH and its affiliate, Host Terminals, Inc. in the marine terminal business. Kinder Morgan has unashamedly tried to unreasonably and unduly disadvantage TPH. In short, Kinder Morgan has done far more than "accord[] different treatment" to TPH and the 63 agents on the Approved Agents List. 2015 FMC LEXIS 44, at * 20. Kinder Morgan intentionally excluded TPH from the Approved Agents List, while including almost all other agents in the marketplace. As a result, TPH is banned from Kinder Morgan terminals, while others are welcomed as always.

Third, Kinder Morgan's ban on TPH is not, and cannot be, "justified by differences in transportation factors." *Id.*; *see, e.g., Ceres Marine Terminals, Inc. v. Maryland Port Admin. (Ceres II)*, 29 S.R.R. 356, 369, 372 (FMC 2001) ("The Commission is not responsible for ensuring that everybody makes a good deal -- just that the commercial environment is not hampered by unreasonable or unjustly discriminatory practices."). TPH has a long-standing

15

safety record of outstanding practices. TPH is fully insured. In November 2015, TPH was named International Bulk Ships Agent of the Year by the International Bulk Journal. TPH complies with all of Kinder Morgan's dock and safety policies. Kinder Morgan has never disputed that TPH complies with all safety and insurance requirements. In other words, TPH meets all of Kinder Morgan's supposed criteria mentioned in the Blacklist Notice. Importantly however, TPH does not satisfy the unwritten criterion – that agents cooperate, deal, partner or "create synergies" with Kinder Morgan by declining to compete with Kinder Morgan, including in the operation of marine terminals, although Kinder Morgan has not applied this unwritten criterion to FEDNAV International Ltd. Because Host Terminals, Inc. competes with Kinder Morgan in the marine terminal business, Kinder Morgan has punished TPH. Kinder Morgan's bully tactics are not in furtherance of, or related to, a legitimate transportation factor. Notably, unlike the typical § 41106 cases based on differing prices, rates, and terms of leases and contacts, here, Kinder Morgan has imposed an explicit ban on TPH from conducting *any business* at its facilities. Such blatant discrimination is far worse than necessary for the FMC to find Kinder Morgan to have violated § 41106. In light of TPH's satisfactory work performance, safety history, and local logistical knowledge, there is no legitimate transportation factor that could possibly justify the Blacklist Notice's anti-competitive boycott of TPH. TPH will prove the third element of its § 41106 claim.

Finally, TPH has suffered and will suffer actual injury. To date, TPH has already lost multiple appointments for upcoming port calls at Kinder Morgan terminals because of the Blacklist Notice effective July 1, 2016. For example, Kinay Chartering, a TPH customer, has a vessel due in Norfolk on July 12, 2016. Ordinarily, it would appoint TPH as its agent. As a direct result of the Blacklist Notice however, it had to appoint TPH's competitor, Capes Shipping, to

avoid the risk of having Kinder Morgan reject the vessel upon arrival at the terminal or having Kinder Morgan require the vessel to vacate its berth after arrival, as Kinder Morgan threatened in the Blacklist Notice.

Similarly, another customer, International Materials, Inc., switched agents for a June 30 arrival in Charleston. Because the vessel will be arriving later than scheduled on the 30th, and the Blacklist Notice takes effect July 1, International Materials, Inc. hired a competitor agent instead. It apologized, saying "[w]e are receiving a lot of pressure from Kinder Morgan, thus, we will have to go with an alternative agent."

In addition to the direct lost business, TPH has suffered actual reputational injury and loss of good will because of the Blacklist Notice. By its terms, the Blacklist Notice suggests that the agents excluded from the Approved Agents List, such as TPH, suffer from safety violations and/or lack proper insurance. To the contrary, TPH has not had, and does not have, these problems. Because the Blacklist Notice and Approved Agents List's ban on TPH is so blatant, arbitrary, and capricious and because TPH has a great reputation and service, customers have *assumed* that TPH must have done *something* wrong to earn such a ban. That is the natural inference propagated by the Blacklist Notice. However, as Kinder Morgan has admitted, TPH has done nothing wrong. Kinder Morgan has decided to ban TPH as an act of intimidation, unjustified retribution, and intentional injury because of Host Terminals, Inc.'s involvement in the terminal management business.

Moreover, because the loss of customers is typically irreversible, TPH's injury is multiplied. Once customers acquiesce in Kinder Morgan's ban and hire other agents to handle vessels, once new relationships develop, they will not likely revert back to TPH if the ban is later lifted. Rather, the nature of the industry relies on relationships and confidence. Once a switch is

made and new relationships are developed, TPH's customers are likely gone forever. Thus, a preliminary injunction is necessary to prevent irreparable harm to TPH.

TPH will be successful on the merits in the FMC. That alone is sufficient to satisfy the first prong of the preliminary injunction test. *Western Industries-North, LLP v. Lessard*, No. 1:12cv177, 2012 U.S. Dist. LEXIS 33683, at *16 (E.D. Va. Mar. 13, 2012) (citing *McNeil-PPC v. Granutec, Inc.*, 919 F. Supp. 198, 203 n.2 (E.D.N.C. 1995)) ("Where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief."). Notwithstanding, TPH is likely to succeed on its other claims as well.

### 2. Kinder Morgan's Tortious Interference

The requisite elements for a prima facie showing of a tortious interference with a contract are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted. *Duggin v. Adams*, 234 Va. 221, 226 (1987) (citations omitted).

When a contract is terminable at will, or only prospective, there is an additional element – the defendant must interfere by improper methods. *Id.* "Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes [e.g., the Shipping Act], regulations, or recognized common-law rules." *Id.*at 227 (citing *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982)). "Improper methods may [also] include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship," as well as violations of "established standard

18

of a trade or profession, or involve unethical conduct, . . . [s]harp dealing, overreaching, or unfair competition." *Id.* at 228 (internal citations omitted).

Here, Kinder Morgan has plainly interfered with TPH's contracts, relationships, and business expectancies with its customers with an intent to injure TPH's business. TPH has maintained ongoing business relationships with numerous shippers and charterers over the years. TPH has cultivated these relationships through history and outstanding service as an agent. These relationships result in the business certainty that these customers will continue to appoint or hire TPH as their agent for port calls, including calls at Kinder Morgan terminals. Customers insist upon using TPH as their agent. Indeed, many dictate that TPH is the required or preferred agent into their contracts for ocean freight and shipping. That is, in the contract between buyers and sellers of cargo, sellers require, as a term or condition, that TPH will serve as the agent. Thus, TPH will establish that it has had, and does have, numerous valid contractual relationships and business expectancies for agency services at Kinder Morgan terminals into the foreseeable future.

Second, Kinder Morgan knows of TPH's business expectancies. TPH has been present on the waterfront providing agency services since before Kinder Morgan's foray into operating marine terminals and Kinder Morgan's founding in 1997. TPH has provided its agency services at Kinder Morgan terminals for the last fifteen years. As a result of their relationship and Kinder Morgan's general knowledge of the industry (as exemplified by, among other things, the Approved Agents List attached to the Blacklist Notice), Kinder Morgan knew of TPH's business expectancies and contractual relationships. Kinder Morgan's interference was well-planned and specifically targeted at TPH's ongoing business relationships.

Third, TPH will prove that Kinder Morgan, via the Blacklist Notice and Approved Agents List, has intentionally interfered with TPH's business expectancies with the goal and result of destroying the expectancies. Kinder Morgan has made its intentions clear with the Blacklist Notice – it aims to destroy TPH because of Host Terminals, Inc.'s competition in the marine terminal business dominated by Kinder Morgan. Kinder Morgan admitted this to TPH during the June 3, 2016 meeting in Houston. Moreover, because the Blacklist Notice, Approved Agents List, and related actions of Kinder Morgan violate the Shipping Act, violate the Virginia business conspiracy statute, are sharp dealing, constitute unfair competition, overreaching, and are independently tortious, among other things, they are improper methods of interference. Kinder Morgan has conceded that its sole aim was to bully TPH into giving up its affiliate's terminal business.

Finally, TPH will prove the resulting damage from Kinder Morgan's interference. All of TPH's business expectancies and contracts to perform agency services at Kinder Morgan terminals will be lost. As a direct result of the Blacklist Notice and Approved Agents List, TPH will lose approximately $2.2 million per year in revenue, and substantial profit flowing from the lost revenue, for the foreseeable future, as well as valuable (and long developed) customer goodwill. As outlined above and as TPH will prove with live testimony, TPH will be successful on the merits of its tortious interference claims.

### 3. Kinder Morgan's Attempted Business Conspiracy

Virginia Code § 18.2-499 makes it illegal for "[a]ny two or more persons [t]o combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) . . . preventing or hindering another from doing or performing any lawful act."

Va. Code Ann. § 18.2-499(A). Virginia Code § 18.2-499 also makes it illegal for any person to "*attempt* to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A." *Id.* § 18.2-499(B) (emphasis added). By definition, individuals acting alone can violate § 18.2-499(B)'s prohibition on attempts to conspire. *See Greenspan v. Osheroff*, 232 Va. 388, 399 (1986). In addition to being the victim of a class 1 misdemeanor, "[a]ny person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel . . . ." *Id.* § 18.2-500(A).[3]

TPH will succeed in proving that Kinder Morgan has attempted to procure the participation, assistance, agreement and/or cooperation of TPH's agency competitors to injure TPH. To establish a cause of action for attempted conspiracy, a plaintiff must plead that a defendant (i) attempted (ii) to procure the assistance of any one or more persons (iii) to enter into any combination, association, agreement, mutual understanding or concert (iv) for the purpose of willfully or maliciously injuring a plaintiff in reputation, trade, business, or profession, and (v) resulting damage to the plaintiff. *See* Va. Code Ann. § 18.2-499(B); *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014). Moreover, the Fourth Circuit has recognized that, consistent with federal notice pleading, the allegations need not provide immense detail. *See, e.g., T.G. Slater & Son v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 845 (4th Cir. 2004) (reversing the district court's dismissal and holding that allegations that the relevant conduct was "intentional, purposeful and without lawful justification" and resulted in

---

[3] In addition, TPH is entitled to injunctive relief from Kinder Morgan's violation of § 18.2-499. *See* § 18.2-500(B).

"substantial monetary damages to Slater & Son" were sufficient to state a business conspiracy claim).

Here, Kinder Morgan's attempt to procure participation in unlawful acts lies in the Blacklist Notice's prohibition on non-approved agents like TPH using approved agents as their sub-agents, and vice versa. This prohibition, combined with Kinder Morgan's market power, will work to create a "mutual understanding," with all other agents, to boycott TPH. Kinder Morgan needs the "assistance" of other agents to achieve its goal of injuring TPH's business. Without the threat of injuring agents who serve as sub-agents for TPH, Kinder Morgan would be unable to meet its goal of *completely* banning TPH from conducting any business in connection with Kinder Morgan terminals. Knowing this, the Blacklist Notice states: "Further, approved Agents shall NOT act as a subagent for a non-approved Agent." And, "[a]ny attempt to circumvent this agency policy may result in Kinder Morgan rejecting a vessel calling on a Kinder Morgan facility or dock, ceasing cargo operations, or requiring the vessel to immediately vacate the berth . . . ." Through these prohibitions, Kinder Morgan has sought the assistance of other agents to unlawfully and maliciously injure TPH's business and to prevent TPH from otherwise performing its lawful business. Thus far, it has worked.

By imposing the Blacklist Notice, Kinder Morgan has, in violation of Virginia Code § 18.2-499(B), prohibited TPH's customers from using TPH as its agent and, in doing so, has attempted to procure, and has, in fact, procured, through its threats and intimidation, the participation, cooperation, agreement or assistance of TPH customers, into a combination, association, agreement, mutual understanding or concert to effect a violation of Virginia Code § 18.2-499(A). Moreover, these prohibitions violate the Shipping Act and constitute tortious interference with contracts and business expectancies. It is without question that Kinder Morgan

took action to impose the Blacklist Notice intentionally, purposely and without legal justification. Accordingly, TPH will be successful on the merits on is claim for violation of Virginia Code § 18.2-499(B).

**B.     TPH Will Suffer Irreparable Harm if the Court Does Not Grant an Injunction.**

"It is clear that TPH will suffer an irreparable loss of customers without an injunction. "Generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-552 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)). The Fourth Circuit has explicitly held that **"when the failure to grant preliminary relief creates the *possibility* of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong *is satisfied*."** *Id.* (emphasis added) (citing *Merrill-Lynch, Pearce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)); *see also Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) ("[R]elations with customers and investors, [and] the good will built up by a heretofore successful enterprise" is "incalculable not incalculably great or small, just incalculable.").

In *Multi-Channel TV*, the Fourth Circuit affirmed the grant of a preliminary injunction. That case arose out of a dispute between competing cable providers in Charlottesville. One provider, Adelphia, had historically provided cable services directly to individual tenants in a certain group of multi-dwelling units. Adelphia's system allowed each tenant to purchase the cable without the involvement of the owner of landlord. *Id.* at 548-49. Abruptly, the property manager of the relevant complexes signed an agreement with the other provider, CQC, to provide a microwave to antenna cable distribution system and remit a 12% "consultant fee" of

23

CQC's tenant revenue. CQC's installation of its system "abruptly terminated Adelphia's service to its subscribers within the MDUs without the prior consent of either the tenants or Adelphia." *Id.* at 549. Thereafter, Adelphia filed suit and alleged various claims, including: interference with an easement or irrevocable license; conversion of Adelphia's cable distribution system; tortious interference with Adelphia's contractual relationships; and common law and statutory conspiracy. *Id.*

Adelphia also sought a preliminary injunction "to prohibit the named defendants from operating under the exclusive provider agreement and to allow Adelphia to continue providing cable service to the MDU tenants pending the litigation." *Id.* at 549. The court found that Adelphia would likely succeed on its claims, including tortious interference with contractual relations, that it would be irreparably harmed without an injunction, and granted the preliminary injunction. *Id.* at 550. The glaring irreparable harm was "the possibility of permanent loss of customers to a competitor or the loss of goodwill." *Id.* at 552. The trial court and the Fourth Circuit rejected CQC's argument that because Adelphia was seeking to prevent loss of revenue, a damages figure could be easily calculated. Because Adelphia's terminated service varied by tenant and tenant choices, its losses could not be easily calculated. "Moreover, the threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm." *Id.*

This court has likewise recognized that "'loss of clients' goodwill and future business . . . [is] difficult, if not impossible, to measure fully.'" *Western Industries-North, LLP v. Lessard*, No. 1:12cv177, 2012 U.S. Dist. LEXIS 33683, at *27 (E.D. Va. Mar. 13, 2012) (granting preliminary injunction) (quoting *Fidelity Global Brokerage Grp., Inc. v. Gray*, No. 1:10cv1255, 2010 U.S. Dist. LEXIS 119121, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (granting

preliminary injunction)). In *Western Industries North*, the plaintiff pest-control business sued a terminated employee for breach of his covenant not to compete. The plaintiff's business was based on trained, bed bug-detecting dogs. The defendant was a handler of a particular dog. Eventually, the plaintiff terminated the defendant for conducting a competing moonlighting business in violation of his employment agreement. After termination, however, the defendant refused to return the dog.

The plaintiff sought preliminary injunctive relief requiring return of the dog, and the court granted it. *Id.* at *28-30. The court recognized that the plaintiff would clearly lose future business so long as the defendant was not enjoined to return the dog. The plaintiff owned four scent dogs. Thus, "[the dog]'s absence deprives Plaintiff of a substantial chunk of its business." *Id.* at *29. As a result, the court held that plaintiff would suffer irreparable harm in the form of lost business without an injunction.

Here, TPH stands to lose customers permanently if Kinder Morgan is allowed to alter the status quo. As this court has recognized, "[t]he likelihood of irreparable harm in customer solicitation cases such as this one is obvious. 'Customers cannot be 'unsolicited,' and Plaintiffs' 'loss of clients' goodwill and future business . . . [is] difficult, if not impossible, to measure fully.'" *Fid. Global Brokerage Group, Inc. v. Gray*, 2010 U.S. Dist. LEXIS 119121, at *7 (E.D. Va. Nov. 9, 2010) (quoting *Merrill Lynch v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985) and *IDS v. SunAmerica*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997)). Just like the plaintiff in *Multi-Channel TV*, TPH's appointments and revenues from customers calling on Kinder Morgan terminals is "a la carte." 22 F.3d at 552. TPH's agency business necessarily depends on when and how many vessels come to port. Accordingly, it is difficult to calculate with precision any damages figure for TPH's loss of revenue. More importantly though, the looming threat of a

permanent loss of customers to its competitors cannot be repaired or reduced to a dollar value. Just like the bedbug-sniffing dog in *Western*, business at Kinder Morgan's terminals constituted a "substantial chunk" of TPH's business. 2012 U.S. Dist. LEXIS 33683, at *29. The loss of customers will be devastating and irreversible. Accordingly, TPH will suffer irreparable harm in the absence of an injunction.

## C. The Balance of Hardships Is in TPH's Favor.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Here, TPH seeks to maintain the status quo – being able to conduct its lawful business at Kinder Morgan terminals – during the pendency of this action and its complaint before the FMC. To the extent that Kinder Morgan has already implemented or begun to enforce the Blacklist Notice and Approved Agents List, the injunctive relief TPH seeks is still prohibitory and in preservation of the status quo. "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). And, "[t]he status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'" *Aggarao*, 675 F.3d at 378 (quoting *Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir. 1980)). After placing the injunctive relief TPH seeks into perspective, the balance of hardships heavily tips in favor of TPH.

The absence of an injunction, and thus the implementation and enforcement of the Blacklist Notice, will impose a far greater hardship on TPH than any hardship, if any, that an injunction would impose on Kinder Morgan. As explained above, if the Blacklist Notice and Approved Agents List are enforced, TPH will suffer an irreparable loss of customers and lose a large chunk of its business. If the Court prevents enforcement of the Blacklist Notice, then Kinder Morgan will suffer no hardship, and the status quo will continue. It and TPH will conduct business as they have, and as vessel agents and marine terminal operators have, for many years. There is no risk of harm in preserving the status quo. Just as the "state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional," *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted) (vacated on other grounds), Kinder Morgan is in no way harmed by an injunction that prevents enforcement of a policy likely to be found unlawful. As noted above, Kinder Morgan announced the Blacklist Notice on May 4, 2016, effective July 1, 2016. In the interim 57 days, Kinder Morgan permitted TPH to enter, and coordinate port calls at, its terminals. Thus, Kinder Morgan has demonstrated by its own policy that it will not be harmed by an injunction preserving the status quo and allowing TPH to do its job at Kinder Morgan terminals until this case is tried on the merits in this Court as well as before the FMC.

In *North American Soccer League v. National Football League*, 465 F. Supp. 665, 677 (S.D.N.Y. 1979) for example, the court granted a preliminary injunction to prevent the NFL's enforcement of a ban on cross-ownership. In that case, the NFL amended its bylaws to impose draconian sanctions, including divesture of interest, on any team whose owner also owned an interest in any other non-football professional sports team. Recognizing that allowing enforcement of the ban would disturb the status quo, rather than preserve it, and that the NFL

pointed to no factors "indicating that it will be harmed if [the] policy . . . [was] kept on the bench during the pendency of th[e] litigation," the court found that the balance of hardships tipped in the plaintiffs' favor. *Id.* It granted the injunction accordingly.

Here too, there is no harm to Kinder Morgan resulting from maintaining the status quo. Much like the ban the NFL sought to enforce in *North American Soccer League*, which also was alleged to stem "solely from anticompetitive animus," Kinder Morgan's ban on TPH imposes far greater harm to the plaintiff than an injunction preventing its enforcement would to the defendant. Moreover, preservation of the status quo will allow TPH's customers to continue using TPH as the agent of their choosing. It is clear that the balance of hardship tips in favor of TPH.

**D.      An Injunction Prohibiting Enforcement of the Blacklist Notice Will be in the Public Interest.**

Granting an injunction barring enforcement of the Blacklist Notice and Approved Agents List will be in the public interest. The purpose of the Shipping Act, as declared by Congress, is "to establish a nondiscriminatory regulatory process for the common carriage of goods by water in the foreign commerce of the United States with a minimum of government intervention and regulatory costs." 46 U.S.C. § 40101(1). To that end, the public interest is best "served by an efficiently run and developed port facility." *Western Holding Group, Inc. v. Mayaguez Port Comm'n*, 611 F. Supp. 2d 149, 192 (D.P.R. 2009). Open competition in the marketplace results in efficiency. *See, e.g., Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990) (recognizing "the public interest in free competition"); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1176 (7th Cir. 1983) (Wood, J., dissenting) ("[G]ood healthy competition itself fosters efficiency and results in public benefits."). Courts have recognized that

"it [is] now beyond dispute that 'the public interest' within the meaning of section 15 [of the Shipping Act] includes the national policy embodied in the antitrust laws." *Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261, 274 n.20 (1968) (citation omitted); *Appalachian Coals, Inc. v. United States*, 288 U.S. 344 (1933) ("Congress, in prohibiting restraints of trade and monopolies, adopted the view that the public interest was best served by the maintenance of free competition.").

Here, the public interest will not be impaired by an injunction preventing enforcement of the Blacklist Notice. Indeed, "the touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the [plaintiff]'s rights and protecting the public from the injunction's adverse effects." *E.I. Dupont De Nemours & Co. v. Kolon Indus.*, 894 F. Supp. 2d 691, 709 (E.D. Va. 2012) (quoting *ePlus, Inc. v. Lawson Software, Inc.*, No. 3:09CV620, 2011 U.S. Dist. LEXIS 54957, 2011 WL 2119410, at *17 (E.D. Va. May 23, 2011)). The public interest is better served by allowing full and fair access to marine terminals by agents engaging in true competition. Fair competition at all levels of the supply chain of cargo results in lower prices. Moreover, TPH's presence in handling vessels will improve public safety on the navigable waterways based on its extensive local and professional knowledge of the various ports it works at, and has worked at, for years. If Kinder Morgan is allowed to enforce the Blacklist Notice, then the public interest will suffer as a result of an arbitrary marketplace ban. Accordingly, the public interest prong of the preliminary injunction test favors TPH and the grant of a preliminary injunction.

## IV. Conclusion

Based on the foregoing, the Court should grant TPH's Motion for Preliminary injunction and enter an order enjoining Kinder Morgan as described in the Motion and Proposed Order filed herewith.

**T. PARKER HOST, INC.**

By: _____
                    Of Counsel

Hunter W. Sims, Jr. (VSB No. 09218)
Patrick H. O'Donnell (VSB No. 29637)
Clark J. Belote (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Phone: (757) 624-3000
Fax: (888) 360-9092
E-mail: hwsims@kaufcan.com
E-mail: phodonnell@kaufcan.com
E-mail: cjbelote@kaufcan.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing will be served via private process server

on the following:

CT Corporation System, R/A
4701 Cox Road, Suite 285
Glen Allen, VA 23060
*Registered Agent for: Kinder Morgan Liquids Terminals, LLC; Kinder Morgan Bulk Terminals, Inc., Kinder Morgan Services, LLC, Kinder Morgan Southeast Terminals, LLC, Kinder Morgan Materials Services, LLC, Kinder Morgan Operating L.P. "A"; Kinder Morgan Operating L.P. "C"; Kinder Morgan Operating L.P. "D"; Kinder Morgan Transmix Company, LLC*

Corporation Service Company, R/A
1111 East Main Street, 16th Floor
Richmond, VA 23219
*Registered Agent for Kinder Morgan G.P., Inc.*

CT Corporation System, R/A
1200 South Pine Island Road
Plantation, FL 33324
*Registered Agent for Nassau Terminals, LLC*

CT Corporation System, R/A
1999 Bryan Street, Suite 900
Dallas, TX 75201-3136
*Registered Agent for Kinder Morgan, Inc.*

By: _____
Of Counsel

Hunter W. Sims (VSB No. 9218)
Patrick H. O'Donnell (VSB No. 29637)
Clark J. Belote (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
Email: hwsims@kaufcan.com
Email: phodonnell@kaufcan.com
Email: cjbelote@kaufcan.com
*Counsel for Plaintiff*

31